**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE**

| | | |
|---|---|---|
| **HUBBARD AUTO CENTER, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CASE NO. 4:05-CV-41-AS-APR** |
| | ) | |
| **GENERAL MOTORS CORPORATION** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM, OPINION, & ORDER**

The Defendant, General Motors Corporation, moved for summary judgment in this case [DE 41] in accordance with Federal Rule of Civil Procedure 56(c), to which the Plaintiff objected. The Court heard oral arguments on this motion in Lafayette, Indiana on June 6, 2008. Having reviewed the parties' briefs and accompanying materials, the Court now **GRANTS** the Defendant's motion.

I. <u>Summary Judgment Standard</u>

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of

the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionary Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986). Rule 56(e) states that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986).

II. Background

Hubbard Auto Center, Inc., ("Hubbard") is a car dealership in Monticello, Indiana. Hubbard sells products manufactured by General Motors Corporation ("GM"), and one of the product lines carried by Hubbard is Oldsmobile. Hubbard and GM entered into a five-year Oldsmobile Dealer Agreement as of November 1, 2000, which, by the terms of the agreement, was set to expire on October 31, 2005.

Oldsmobile lost significant amounts of money and market share throughout the late

1990's. GM invested money in Oldsmobile and employed various studies to review and attempt to improve the sales of the Oldsmobile brand. Those efforts, however, proved futile. In late November 2000, Ronald Zarella (President of GM North America) and G. Richard Wagoner (GM's Chief Executive Officer) decided to phase out the Oldsmobile Division. This decision was reviewed and approved by GM's Board of Directors on December 5, 2000.

On December 12, 2000, GM announced that the Oldsmobile line would be phased out throughout the United States. Defendant's Memo in Support of Summary Judgment at 9; Exhibit 2 to Hubbard Deposition. GM sent a follow-up notice to Oldsmobile dealers on December 14, 2000 stating:

> the Oldsmobile announcement is not a termination of the Dealer Agreement with any Oldsmobile dealer. Oldsmobile products will continue to be provided for their current model life cycles, unless market demand falls below economically viable levels. During this period, GM will, of course, continue to fulfill its obligations under the Dealer Agreement. GM will also continue its sales, service and parts support for Oldsmobile products.

Defendant's Memo in Support of Summary Judgment at 9; Exhibit 3 to Hubbard Deposition. Also on December 14, 2000, GM announced its "Transition Financial Assistance Program" ("TFAP") for Oldsmobile dealers. That program offered monetary compensation for the loss of the Oldsmobile franchise. Hubbard did not enter into an agreement with GM under the TFAP. On October 27, 2004, GM issued a letter to Mr. Hubbard. That letter stated:

> General Motors also advised all Oldsmobile Dealers it would provide them with twelve months advance written notice prior to any actual non-renewal of the Oldsmobile Dealer Agreement. Accordingly, based on the previously announced decision to phase out Oldsmobile Division as communicated in the attached December 12, 2000 letter, GM is now providing Hubbard Auto Center, Inc. with twelve months advance notification of General Motors intent not to renew the Oldsmobile Dealer Sales and Service Agreement currently in effect between Hubbard Auto Center, Inc. and General Motors upon its expiration on October 31, 2005.

3

Defendant's Memo in Support of Summary Judgment at 9; Exhibit 21 Letter from W. Stacy to R. Hubbard, October 27, 2004.

Hubbard filed a four-count Complaint [DE 1] in this Court on June 30, 2005. In an Order issued on March 31, 2006, the court dismissed Hubbard's claims insofar as they were predicated on Indiana Code § 23-2-2.7-2(1)(iv) and (2). The Court also held that, consistent with the terms of the Dealer Agreement, Michigan law governs Hubbard's contract claims. An Amended Complaint [DE 21] was filed on April 18, 2006, and on April 1, 2008, GM filed its Motion for Summary Judgment [DE 41].

### III. Discussion

Hubbard's Amended Complaint includes three separate counts: violations of Indiana's franchise statutes (Count I); breach of contract claims (Count II); and breach of implied covenant of good faith and fair dealing (Count III). GM has moved for summary judgment on all counts. Each of these counts will be discussed in turn.

#### A. *Indiana Franchise Statutes*

Hubbard's Amended Complaint asserts that GM violated Indiana Code § 23-2-2.7-1(7) and (8) for terminating or non-renewing Hubbard's Oldsmobile Dealer Agreement without good cause or in bad faith. Amended Complaint ¶ 32. GM contends that it had good cause for the non-renewal of Hubbard's Oldsmobile Dealer Agreement, barring any claim under sections 23-2-2.7-1(7) (termination) and (8) (non-renewal). The relevant portions of Indiana Code § 23-2-2.7-1(7) and (8) state:

> Sec. 1. It is unlawful for any franchise agreement entered into between any franchisor and a franchisee who is either a resident of Indiana or a nonresident who will be operating a franchise in Indiana to contain any of the following provisions:

4

> (7) Permitting unilateral termination of the franchise if such termination is without good cause or in bad faith. Good cause within the meaning of this subdivision includes any material violation of the franchise agreement.
>
> (8) Permitting the franchisor to fail to renew a franchise without good cause or in bad faith. This chapter shall not prohibit a franchise agreement from providing that the agreement is not renewable upon expiration or that the agreement is renewable if the franchisee meets certain conditions specified in the agreement.

Ind. Code § 23-2-2.7-1(7) and (8).

First, Hubbard seemingly alleges that GM "terminated" the Dealer agreement before its expiration date by announcing the eventual phase out of the Oldsmobile Division on December 12, 2000. The terms "terminate" and "non-renewal" are terms of art that are clearly recognized and separated in the statute. The terms, thus, have different and distinct meanings. The court here focuses on the term "terminate." The Dealer Agreement states that GM authorizes Hubbard "as a Dealer to sell and service new motor vehicles commonly known and designated as . . . Oldsmobile." Dealer and Sales Agreement at 2. It is undisputed that the December 12, 2000 announcement did not terminate the agreement because Mr. Hubbard admits that Hubbard Auto Center, Inc. continued selling and servicing vehicles pursuant to the agreement through at least October of 2005. The following exchange occurred during the deposition of Mr. Hubbard:

> Q. Now, the agreement authorized you to sell Oldsmobile vehicles from November of 2000 through October of 2005, correct?
>
> A. November of 2000 through October of '05, that's the dates here, yes.
>
> Q. All right. And did that agreement also authorize you to service Oldsmobile vehicles during that same time frame?
>
> A. It states dealer sales and service, correct.
>
> Q. And you did sell Oldsmobile vehicles pursuant to the terms of that agreement through the contract period, correct?

> A. That's correct.
>
> Q. And it's also true that Hubbard Automotive continued to service Oldsmobile vehicles throughout the five-year term of that agreement, correct?
>
> A. That's correct.

Hubbard Dep. at 90:8-25. Moreover, the December 14, 2000 follow-up letter stated, "the Oldsmobile announcement is not a termination of the Dealer Agreement with any Oldsmobile dealer." Defendant's Memo in Support of Summary Judgment at 9; Exhibit 3 to Hubbard Deposition. Thus, Indiana Code § 23-2-2.7-1(7) does not apply.

Second, Hubbard argues that GM violated Indiana Code § 23-2-2.7-1(8) in that GM has discontinued and failed to renew Hubbard's Oldsmobile Sales and Service Agreement. Amended Complaint ¶ 32. Plaintiff asserts that it has "complied with all terms and conditions of the Sales and Service Agreement and is not in violation of any contractual provisions which would permit GM to involuntarily terminate the Oldsmobile franchise under the termination provisions of the Sales and Service Agreement or under the franchise laws of the State of Indiana." *Id*. at ¶ 33.

However, based on the plain language of the statue, GM is entitled to summary judgment. Indiana Code § 23-2-2.7-1(8) states that a franchise agreement may include a provision stating that the agreement will expire and not be renewed. In this case, the Dealer Agreement states, "[t]his Agreement(s) shall expire on October 31, 2005." Dealer Agreement at 1. Additionally, the Dealer Agreement contemplates and addresses situations in which the Dealer Agreement may expire and may not be renewed. Specifically, Article 15.2.1 of the Dealer Agreement states: "[i]f this Agreement: a) expires . . . and General Motors does not offer Dealer . . . a new dealer agreement . . . ." Accordingly, when GM issued its non-renewal, it did not violate the terms of

Indiana Code § 23-2-2.7-1(8). If the court followed Hubbard's logic, then GM must renew the Dealer Agreement unless Hubbard fails to comply with its obligations. If that were true, then, the Agreement would not be for a fixed, five-year term which is subject to renewal. Instead, the agreement would continue unless and until Hubbard failed to fulfill its obligations or until such time that, by mutual agreement, the parties terminate the agreement. *See Wright-More v. Ricoh Corp.*, 980 F.2d 432, 437 (7th Cir. 1992) (stating that because the contract contained an explicit one-year term, a new written agreement would be necessary for renewal); *Wright-More v. Ricoh Corp.*, 794 F.Supp. 844, 862 (N.D. Ind. 1991) ("the clear intent of the parties was for the Distributorship Agreement to not be automatically renewable, but to be subject to renewal by express agreement of the parties.").

The undisputed evidence in this case demonstrates that GM's discontinuation of the Oldsmobile Division and non-renewal of the Dealer Agreement with Hubbard did not violate Indiana law. GM did not produce any more Oldsmobiles for sale after the phase-out and applied the phase-out to all Oldsmobile dealers equally. As such, the Court finds that GM did not breach the agreement when it let the agreement non-renew according to its terms on October 31, 2005. Because the court finds that GM is entitled to summary judgment based on the plain language of the statute, it need not consider GM's argument in the alternative that it is entitled to summary judgment because Hubbard has offered no evidence that GM acted in bad faith or without good cause in declining to renew its Dealer Agreement.

B. *Breach of Contract Claims*[1]

Hubbard alleges that the Oldsmobile phase-out violates the following requirements of the Dealer Agreement: (1) the obligation "to provide a reasonable quantity and variety of products . . . through the five (5) year term of the Agreement"; (2) the obligation "to permit each dealer the opportunity to achieve a reasonable return on investment if it fulfilled its obligations under the Agreement as set forth in Article 4.1"; and (3) the obligation to "maintain the Sales and Service Agreement in full force and effect indefinitely unless terminated pursuant to the termination provisions of the Sales and Service Agreement or as allowable under Indiana law." Amended Complaint ¶ 37. Hubbard also argues that GM caused, "by its elimination and dismantling of its Oldsmobile brand in the various manners and means described herein, the de facto termination and, by way of the October 2004 letter, the actual termination of Plaintiff's Sales and Service Agreement on grounds not authorized by the provisions of the Sales and Service Agreement in violation of Article 14.5 of its Standard Provisions." Amended Complaint ¶ 38.

As stated above, Plaintiff's claims that GM "terminated" the Dealer Agreement before its expiration fail as a matter of law. The Dealer Agreement gave Hubbard the right to sell and service Oldsmobile vehicles from November of 2000 through October 31, 2005. By his own admission, GM did not terminate the Hubbard's Dealer Agreement. This is evidenced by Hubbard's own statement that the Hubbard dealership continued to operate as an Oldsmobile dealer throughout the term of the agreement. *See* Hubbard Dep. at 90:8-25. Hubbard's claim that GM did not have the right to non-renew the Dealer Agreement also fails. As discussed in detail

---

[1] The Court previously held that, consistent with the terms of the Dealer Agreement, Michigan law governs Hubbard's contract claims. March 31, 2006 Order.

above, GM's conduct in electing not to renew the Dealer Agreement with Hubbard did not violate Indiana law because the agreement stated that it had a defined term from November 1, 2000 through October 31, 2005. When asked about the agreement at his deposition, Mr. Hubbard stated that he sold Oldsmobiles pursuant to the Oldsmobile agreement and that the term of the agreement was from "November of 2000 through October of '05." Hubbard Dep. at 90:11.

Hubbard also argues that GM violated Article 6.1 of the Dealer Agreement by failing to distribute new motor vehicles among its dealers in a fair and equitable fashion. Article 6.1 states:

> General Motors will endeavor to distribute new Motor Vehicles among its dealers in a fair and equitable manner. Many factors affect the availability and distribution of Motor Vehicles to dealers . . . General Motors reserves to itself the discretion in accepting orders and distributing Motor Vehicles, and its judgments and decisions are final. Upon written request, General Motors will advise Dealer of the total number of new Motor Vehicles, by allocation group, sold to dealers in Dealer's Market Area or Region during the preceding month.

Article 6.1 (emphasis added). Plaintiff has not come forward with any evidence showing that Hubbard was treated differently than any other Oldsmobile dealer with respect to vehicle distribution as a result of the phase-out of the Oldsmobile line. As GM adeptly points out, at his deposition, Mr. Hubbard admitted that GM's distribution of Oldsmobile was non-discriminatory:

> Q.  And so all of the Oldsmobile dealers in the state of Indiana were, to your knowledge, receiving the same information that you did?
>
> A.  To my knowledge.
>
> Q.  Do you have any reason to believe that you were treated differently from any other Oldsmobile dealer with respect to the phaseout?
>
> A.  I'm unaware of that.

Hubbard Dep. at 111:7-15.

Hubbard next argues that GM violated Article 6.4.1 for failing to provide a sufficient mix

9

of models. Article 6.4.1 states:

> Dealer recognizes that customers expect Dealer to have a reasonable quantity and variety of current model Motor Vehicles in inventory. Accordingly, Dealer agrees to purchase and stock and General Motors agrees to make available, subject to Article 6.1, a mix of models and series of Motor Vehicles identified in the Motor Vehicle Addendum in quantities adequate to enable Dealer to fulfill its obligations in its Area of Primary Responsibility.

Nothing in this provision guarantees Hubbard a right to compete, and there is no evidence showing that GM failed to provide a "sufficient" mix of models. There is no evidence to show that Hubbard ordered an Oldsmobiles and GM failed to provide them. Accordingly, GM did not interfere with Hubbard's ability to fulfill its obligations in its Area of Primary Responsibility. Moreover, Mr. Hubbard confirmed that GM never claimed that Hubbard Auto Center, Inc. failed to meet its Area of Primary Responsibility as required under Article 6.4.1:

> Q. Did anyone at General Motors ever contend that Hubbard had failed to fulfill its obligations under the area of primary responsibility for Oldsmobile?
>
> A. That Hubbard had failed their responsibility?
> Q. Right.
>
> A. Not to my knowledge.
>
> ***
>
> A. Let me clarify. Asking if my dealership - -
>
> Q. Yes.
>
> A. - - did not fulfill an obligation to them?
>
> Q. Right.
>
> A. Again, I stand on what I said. Not to my knowledge. Behind closed doors they may have, but not to my knowledge.
>
> Q. I'm not aware of any evidence that someone from GM has suggested that - -

> A. To my face, that I didn't do my job - - they would be discouraged that we would not take some inventory. That's always the case that they want you to take extra inventory or overproduced inventory or problem inventory, that's always the case and we might – when we say no, I'm sure this guy (indicating) can back it up, it's not a fun deal, is it?
>
> Q. But the point is that with respect to the APR, nobody from the company is claiming that you guys weren't fulfilling your APR responsibility, isn't that true?
>
> A. APR?
>
> Q. Area of primary responsibility.
>
> A. No. That was not the case, no.

Hubbard Dep. 157:16-25 - 158:1-23. Because GM never claimed that Hubbard was failing to meet his Area of Primary Responsibility, the requirements for liability in Article 6.4.1 have not been met, and Hubbard's claims for breach of contract under this provision fail as a matter of law.

Hubbard's final breach of contract claim alleges that GM violated Article 4.1 of the Dealer Agreement by failing "to permit each dealer the opportunity to achieve a reasonable return on investment . . . ." Amended Complaint ¶ 38. Article 4.1 provides:

> Because General Motors distributes its Products through a network of authorized dealers operating from approved locations, those dealers must be appropriate in number, located properly, and have proper facilities to represent and service General Motors Products competitively and to permit each dealer the opportunity to achieve a reasonable return on investment it if fulfills its obligations under the Dealer Agreement. Through such a dealer network, General Motors can maximize the convenience of customers in purchasing Products and having them serviced. As a result, customers, dealers, and General Motors all benefit.
>
> To maximize the effectiveness of its dealer network, General Motors agrees to monitor marketing conditions and strive to the extent practicable, to have dealers appropriate in number, size and location to achieve the objectives stated above. Such marketing conditions include General Motors sales and registration performance, present and future demographic and economic considerations, competitive dealer networks, the ability of General Motors existing dealers to

11

achieve the objectives stated above, the opportunities available to existing dealers, the alignment of Line-Makes, General Motors dealer network plan, and other appropriate circumstances.

Article 4.1.

The plain language of Article 4.1 is unambiguous and clearly addresses dealer network planning. Moreover, the phrase "achieve a reasonable return on investment" does not impose any contractual duty on GM to permit each dealer the opportunity to achieve a reasonable return on investment; rather, that phrase is merely aspirational language. This conclusion is supported by Mr. Hubbard's own deposition testimony:

> Q. All right. Let me ask it so we have a clear record here. Are you aware of any term in the dealer sales and service agreement that guarantees Hubbard Automotive will be profitable as a General Motors dealer?
>
> A. In print, no.
>
> Q. Are you aware of any term in the dealer sales and service agreement that guarantees or promises you any particular return on investment?
>
> A. Not in print.
>
> Q. Or any return on investment at all?
>
> A. Not in print.

Hubbard Dep. 96:13-25. Because Article 4.1 does not confer the right to make a profit on Hubbard, GM cannot be held liable for any such violation.

### C. *Implied Covenant of Good Faith and Fair Dealing*

Finally, Hubbard contends that, based upon the contractual relationship between Hubbard and GM, GM owed to Hubbard a duty of good faith and fair dealing in the performance and

enforcement of the Sales and Service Agreement and relationship between the parties. Hubbard asserts that GM was required to refrain from taking action which would deprive Hubbard of the benefits to which it is entitled under the Sales and Service Agreement exiting between the parties. Hubbard claims that GM breached its implied covenant of good faith and fair dealing towards the Plaintiff by, among other things, (1) failing to distribute motor vehicles in a fair and equitable manner; (2) failing to provide Plaintiff with a reasonable variety and quantity or mix of vehicles; (3) implementing a system of allocation of motor vehicles to Plaintiff which is unfair, inequitable, discriminatory and designed by operation to terminate Plaintiff's Oldsmobile franchise; (4) engineering the reconfiguration of its dealer network in such manner as to eliminate all Oldsmobile dealers and products and preventing Plaintiff from any possibility of realizing a reasonable return on its investment; (5) failing to comply with the renewal terms of the Dealer Agreement; (6) failing to comply with the termination provisions of the Dealer Agreement; and (7) seeking to terminate the Sales and Service Agreement upon grounds not authorized under the Agreement or under Indiana law. Complaint ¶ 44. Each claim, however, has been expressly addressed in Hubbard's breach of contract claims. Under Michigan law, Hubbard cannot reconstitute a claim for breach of contract as a claim for breach of an implied covenant of good faith and fair dealing. *See Gen. Aviation, Inc. v. Cessna Aircraft*, co., 915 F.2d 1038,l 1041 (6th Cir. 1990). *See also Ann Arbor Acquisition Corp. v. General Motors Corp.*, 2005 WL 658761, *3 (Mich. Ct. App., March 22, 2005) (stating that a "lack of good faith cannot override an express provision in a contract."). In other words, where – as here – rights are expressly reserved by contract, no claim for breach of implied covenant will lie. In this case, the express terms of the Dealer Agreement gave GM full discretion to make final decision regarding of distribution of

vehicles. Hubbard has come forward with no evidence demonstrating that GM abused its contractual right of discretion. As such, GM is entitled to summary judgment on this count of the Amended Complaint.

IV. Conclusion

For the aforementioned reasons, Defendant's Motion for Summary Judgment [DE 41] is GRANTED. The Clerk is directed to enter judgment in GM's favor and close the case.

**SO ORDERED ON AUGUST 14, 2008.**

                                              s/ Allen Sharp
                                              **ALLEN SHARP, JUDGE**
                                              **UNITED STATES DISTRICT COURT**